# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Nicole Lampo, Petitioner,

v.

Amedisys Holding, LLC, and Leisa Victoria Neasbitt, Respondents.

Appellate Case No. 2022-001362

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Georgetown County
Benjamin H. Culbertson, Circuit Court Judge

---

Opinion No. 28265
Heard October 2, 2024 – Filed March 5, 2025

---

## REVERSED AND REMANDED

---

James Paul Porter and Harper Lee Hutson, both of Cromer Babb & Porter, LLC, of Columbia, for Petitioner.

Jason D. Keck, of Chicago, IL, and George A. Reeves, III, of Columbia, both of Fisher & Phillips, LLP, for Respondents.

---

**JUSTICE FEW:** The issue before the Court is whether the parties formed an arbitration agreement. There is no doubt Amedisys Holding, LLC, made its employee Nicole Lampo an offer to resolve all disputes by arbitration. The question

is whether Lampo accepted the offer. Amedisys argues Lampo accepted the offer simply by not taking steps to "opt out" of the "Amedisys Arbitration Program" and continuing to work. The circuit court denied Amedisys's motion to compel arbitration, concluding Lampo's failure to opt out of the program did not constitute acceptance of Amedisys's offer, and thus no arbitration agreement was formed. The court of appeals reversed. *Lampo v. Amedisys Holding, LLC*, 437 S.C. 236, 877 S.E.2d 486 (Ct. App. 2022). We reverse the court of appeals.

## I.     Facts and Procedural History

On July 8, 2013, Amedisys—a national home health and hospice service provider—hired Nicole Lampo as a physical therapist in its Horry and Georgetown County facilities. Amedisys assigned Lampo a unique username and password that enabled her to access her email account and Microsoft Sharepoint, which Amedisys used to share documents and other information with its employees.

On August 6, 2013—approximately one month after Amedisys hired Lampo—Amedisys sent an email to all employees with the subject line, "Important Policy Change - Must Read." The body of the email stated, "This e-mail contains important time-sensitive materials that the Company requires that you read as they could affect your legal rights. Please <u>click here</u> to receive them." When an employee clicked the hyperlink on the words "<u>click here</u>," a form appeared on the employee's computer screen through Sharepoint. The form read,

THE AMEDISYS ARBITRATION PROGRAM

**ACKNOWLEDGMENT FORM**

By clicking "Acknowledge" below, you will be given access to the Amedisys Arbitration Program materials, which include a Cover Letter, the Dispute Resolution Agreement, and FAQs. You are required to review these materials. Please read the materials carefully. **Unless you opt out of the Dispute Resolution Agreement within 30 days of today's date, you will be bound by it, which will affect your legal rights.**

By clicking the "Acknowledge" button on this screen I acknowledge and understand that I will be given access to

the materials described in the above paragraph and that I
am required to review these materials.

X
_____                    Date: 8/6/2013

Electronic Signature

**Acknowledge**

After clicking "Acknowledge," employees were directed to a webpage containing the Dispute Resolution Agreement, with an attached "Opt-Out Form," and the other documents.

The Dispute Resolution Agreement states it is governed by the Federal Arbitration Act and provides, "This Dispute Resolution Agreement is an agreement to resolve any and all legal disputes between you and Amedisys before an arbitrator, rather than in court." The Dispute Resolution Agreement also states it "contains an 'opt-out' provision," referencing Section 9 of the Dispute Resolution Agreement. Section 9 begins, "Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt-out and not be subject to this Agreement." Section 9 then specifically states an employee "may opt-out of this Agreement by printing out . . . the . . . Dispute Resolution Agreement Opt-Out Form . . . and sending it . . . to Amedisys . . . [in] Baton Rouge, Louisiana." Section 9 concludes by providing, "Should Employee fail to opt out of this Agreement within the 30-day period in the manner provided above, Employee's continuation of his or her employment with the Company shall constitute Employee's and Company's mutual acceptance of the terms of this Agreement."

Amedisys's Sharepoint records indicate Lampo used her username and password to access her email, clicked the hyperlink on the words "click here" in the email, and clicked "Acknowledge" on the Acknowledgment Form. Lampo did not submit an opt-out form.

Lampo continued to work for Amedisys for almost five years until she was fired in March 2018. Lampo then filed this lawsuit against Amedisys and Leisa Neasbitt— her former supervisor—for wrongful discharge, tortious interference with

prospective contractual relations, and defamation. Amedisys moved to compel arbitration, arguing Lampo was bound by the Dispute Resolution Agreement because she did not opt out. The circuit court denied Amedisys's motion, stating "there is no . . . evidence of acceptance, mutual assent or a meeting of the minds to warrant declaring the arbitration agreement enforceable." The court of appeals disagreed, finding Lampo accepted Amedisys's offer "as a matter of law." *Lampo*, 437 S.C. at 243, 877 S.E.2d at 490. We granted Lampo's petition for a writ of certiorari to review the court of appeals' decision.

## II. Analysis

An arbitration agreement, of course, is a contract. *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 539, 542 S.E.2d 360, 364 (2001). The elements necessary for the formation of any contract are (1) an offer, (2) acceptance of the offer, and (3) the mutual exchange of benefits the law calls "consideration." *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003). A party seeking to compel arbitration must demonstrate the existence of a valid contract to arbitrate by establishing these three elements. *Wilson v. Willis*, 426 S.C. 326, 336, 827 S.E.2d 167, 173 (2019).

Amedisys's August 6, 2013 email to Lampo and its other employees was a valid offer to form an arbitration agreement. The question here is whether Lampo accepted Amedisys's offer. To accept an offer to form a contract, an offeree must in some manner indicate to the offeror its willingness and desire to enter and be bound by the proposed agreement. Our court of appeals has explained this by relying on the Restatement (Second) of Contracts, stating, "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Electro-Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter*, 357 S.C. 363, 369, 593 S.E.2d 170, 173 (Ct. App. 2004) (quoting Restatement (Second) of Contracts § 69 (Am. L. Inst. 1981)). Ordinarily, this indication of willingness and desire to enter into the contract—this "manifestation of assent" as the Restatement calls it—is based on some action taken by the offeree. The typical action an offeree takes to accept an offer is to sign a writing that sets forth the offer, thereby clearly indicating a willingness and desire to form a contract. However, there are other ways an offeree may accept an offer. In this case, Amedisys contends Lampo accepted its offer to form an arbitration agreement by not "opting out" and continuing to work after receiving notice of its arbitration program, which included the stated directive that she would be deemed to have accepted the offer if she did not opt out.

Amedisys makes several arguments to support its contention that Lampo accepted the offer by not opting out of the arbitration program and continuing to work. First, Amedisys relies on the concept of a "unilateral agreement," such as when a potential employer communicates a specific offer of employment to a potential employee, and the employee performs her job duties in reliance on the offer, thereby accepting the offer of employment. For this argument, Amedisys relies specifically on our opinion in *Prescott v. Farmers Telephone Cooperative, Inc.*, 335 S.C. 330, 516 S.E.2d 923 (1999). In that case, we stated, "A unilateral contract has the following three elements: 1) a specific offer, 2) communication of the offer to the employee, and 3) performance of job duties in reliance on the offer." 335 S.C. at 336, 516 S.E.2d at 926 (footnote omitted) (citation omitted). *Prescott* is inapplicable here, however, because the concept of a unilateral agreement discussed in that opinion is that the employee's performance of the work indicates a willingness and desire to initially accept the terms of employment, thereby *creating* an employment contract. In the hypothetical scenario from *Prescott*,[1] the employee's decision to *begin* work for the employer demonstrates that an employee may accept an initial offer of employment by performing the work that earns him the benefits contained in the offer of employment. If such a potential employee does not begin work, he is not entitled to be paid under the employment contract he has been offered.

Here, Amedisys and Lampo already had an employment contract. Lampo was performing work in reliance on, and being paid pursuant to, the original July 8 offer and contract that did not contain an arbitration provision. The terms of Lampo's employment did not change after she received the August 6 offer to form an arbitration agreement. The work Lampo continued to perform was no different than the work she previously performed, nor was the compensation she received for her work any different from the compensation she previously received. Thus, Lampo's decision to continue working after receipt of the August 6 offer was not performance of the proposed Dispute Resolution Agreement; it was performance of the original employment contract formed a month before. There is no evidence Lampo continued to work after August 6 "in reliance on" the proposed Dispute Resolution

---

[1] Our discussion of a unilateral contract in *Prescott* concerned whether an offer to alter at-will employment status was made, not—as in this case—whether the offer was accepted. 335 S.C. at 337, 516 S.E.2d at 926. The actual result we reached in *Prescott* was that no specific offer had been made, and thus no contract was formed. *Id.* In the course of explaining our decision, however, we discussed how the offer and acceptance of a unilateral contract would work. 335 S.C. at 335-37, 516 S.E.2d at 926.

Agreement rather than the original offer she accepted when she began employment on July 8.

Amedisys's argument that it formed a unilateral contract with Lampo to arbitrate all disputes fails for the additional reason that an agreement to arbitrate is—by definition—a bilateral contract. "A unilateral contract occurs when there is only one promisor and the other party accepts, not by mutual promise, but by actual performance or forbearance." 1 Richard A. Lord, *Williston on Contracts* § 1:17, at 68-69 (Danny R. Veilleux et al. eds., 4th ed. 2007) (footnotes omitted); *see also Prescott*, 335 S.C. at 336 n.5, 516 S.E.2d at 926 n.5 ("A unilateral contract is one 'in which there is a promise on one side only; the consideration on the other side being executed.'" (quoting *McMahan v. McMahon*, 122 S.C. 336, 340, 115 S.E. 293, 294 (1922))); 1 Timothy Murray, *Corbin on Contracts* § 1.23, at 113-114 (rev. ed. 2018) ("In the case of a unilateral contract, there is only one promisor. The legal result is that the promisor is the only party who is under an enforceable legal duty. The other party to this contract is the one to whom the promise is made, and this promise is the only one in whom the contract creates an enforceable legal right."). In an arbitration agreement, the parties necessarily exchange mutual promises to take any dispute to an arbitrator. In fact, the purported arbitration agreement in this case provides, as quoted above, "This Dispute Resolution Agreement is an agreement to resolve any and all legal disputes between you and Amedisys before an arbitrator, rather than in court." Thus, an arbitration agreement must be formed by mutual promises, not by one unilateral promise accepted by the other party's performance.[2]

Amedisys's second argument takes us to the crux of this case, whether Lampo accepted the offer to form an arbitration agreement—as Amedisys argues—by her

---

[2] We do not intend to say that an agreement to arbitrate may never be formed by an employer extending an offer and a prospective employee accepting the offer by performance. If the offer of employment includes an arbitration agreement as part of the employment contract, however, the performance of work that constitutes acceptance of the offer must manifest not merely an agreement to do the work and get paid, but must also manifest the mutual promises to arbitrate any disputes that may arise. *See, e.g.*, *Towles v. United HealthCare Corp.*, 338 S.C. 29, 40, 524 S.E.2d 839, 845 (Ct. App. 1999) (finding an arbitration agreement was formed when the employer made "a specific communication of an offer which conditioned Towles's continued employment on his acceptance of the Employment Arbitration Policy as part of his employment contract"). As we explain, there is nothing in the record that manifests Lampo's intent to form an arbitration agreement.

"fail[ure] to 'opt out' of that agreement" and continuing to work for Amedisys. Initially, this appeared to present a novel question of law in South Carolina, for we have never before considered whether a party may be deemed to have accepted an offer by not "opting out" of the offer. Now that we have studied the matter thoroughly, however, we find the question is not novel at all, and we proceed to resolve the question by applying the standard contract principles that have always governed the formation of contracts in this State.

Amedisys contends that—because the August 6 email and accompanying documents informed Lampo she would be deemed to have accepted the offer if she did not opt out and continued to work—her failure to opt out was a manifestation of her assent to the terms of the Dispute Resolution Agreement and her intent to accept the offer. We do not accept this argument, as we find no evidence in the record that Lampo's silence and inaction in not opting out of the arbitration program indicated to Amedisys her willingness and desire to enter and be bound by the proposed arbitration agreement. We hold, therefore, as a matter of law, that Lampo did not accept Amedisys's offer to form an arbitration agreement.

Silence and inaction can constitute acceptance of an offer, but only in certain circumstances. *See H. A. Sack Co. v. Forest Beach Pub. Serv. Dist.*, 272 S.C. 235, 237, 250 S.E.2d 340, 341 (1978) ("Silence ordinarily does not constitute acceptance." (citations omitted)). These circumstances are limited to those from which it may be inferred that the offeree's silence and inaction meets the "manifestation of assent" test articulated in *Electro-Lab*. *See* 1 Timothy Murray, *Corbin on Contracts* § 3.19, at 497 ("It should here be plainly set forth that an offeror has no power to cause the silence of the offeree to operate as an acceptance when the offeree does not intend it to do so."). The Restatement sets forth examples of when this may occur, such as: (1) "Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation;" (2) "Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer;" and (3) "Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." Restatement (Second) of Contracts § 69(1). We can imagine that silence and inaction may be a manifestation of assent in other circumstances, as well.

In this case, however, there is no circumstance that renders Lampo's silence and inaction to be an acceptance of Amedisys's offer. Turning to the examples provided by the Restatement, the first example is completely inapplicable because Amedisys

did not offer Lampo services with the expectation she would pay for them. The third example is also inapplicable because the only "previous dealings" between the parties in relation to the creation of contracts was the July 8 commencement of Lampo's employment without an arbitration provision, and that event provides no basis on which Lampo should be expected to inform Amedisys of her intent not to accept an offer to modify the employment relationship.

The second example, however, or even the "or otherwise" language of the third example, provides the basis on which Amedisys relies for its central argument. Amedisys essentially argues that its directive to Lampo that she would be deemed to have accepted the offer if she did not opt out gave Lampo "reason to understand that assent may be manifested by silence or inaction," or made it "reasonable that [Lampo] should notify [Amedisys] if [s]he does not intend to accept." The reason for this, according to Amedisys, is the employer/employee relationship the two had been in for approximately one month. When asked at oral argument whether there was any other circumstance—besides the employer/employee relationship—that might make it imperative that Lampo opt out or be deemed to have accepted, Amedisys replied there was "nothing else."

We hold Lampo's decision to continue working and not opt out does not in any way indicate her willingness and desire to enter and be bound by the Dispute Resolution Agreement. Before August 6, Lampo worked according to the terms of the initial July 8 employment agreement. After August 6, there is simply nothing to indicate she did anything different that could be considered a manifestation of assent to the August 6 offer. She simply continued to perform the job duties for which she was already under contract to be paid. Without some manifestation of assent to the new terms of employment set forth in the Dispute Resolution Agreement—the mutual promises of arbitration—there can be no acceptance. *Electro-Lab*, 357 S.C. at 369, 593 S.E.2d at 173.

Despite ruling that Lampo accepted Amedisys's offer, the court of appeals appeared to recognize the difficulty in finding a "manifestation of assent" in Lampo's silence and inaction in simply not opting out of the arbitration program while continuing to work under the original terms of her employment. The court of appeals stated, "We caution that the arbitration agreement designed by Amedisys may well be at the outer limits of what constitutes a valid offer to modify the terms [of] an employment agreement to add an arbitration agreement." *Lampo*, 437 S.C. at 244, 877 S.E.2d at 491. Likewise, we are concerned whether there is in the court of appeals' reasoning any limiting principle that would keep an employer from using the opt-out procedure to accomplish other changes in an employment contract. In our view, if Lampo's

silence and inaction here amounts to acceptance of Amedisys's offer, then there is *no* limit to an employer's power to force acceptance to modifications to an employment agreement. During oral argument, Chief Justice Kittredge asked whether an employer could use an employee's silence and inaction through the opt-out procedure to reduce an employee's salary or to limit vacation previously promised. We wonder whether an employer may force other unacceptable changes, such as an employer self-insured for medical benefits using an employee's silence in the face of an opt-out notice to reduce the employer's exposure for paying major medical expenses. Acting Justice Curtis—in a fascinating turn of the tables on this notion of an "opt-out" method of forcing acceptance on an employee—asked whether *an employee* might use an opt-out procedure back against the employer to increase the employee's salary. If Lampo's silence and inaction here is an acceptance, then all of these seemingly-ridiculous scenarios become contracts. This we will not accept.

There are a few other issues raised by the parties or addressed by the court of appeals that we feel we also should address, though they are not important to our decision here. First, Amedisys—like many parties and some of our courts—continues to argue there is a federal and state "policy favoring arbitration." We remind our litigants and lower courts that we dispensed with this incorrect notion almost four years ago. *See Palmetto Constr. Grp. v. Restoration Specialists, LLC*, 432 S.C. 633, 639, 856 S.E.2d 150, 153 (2021) ("There is . . . no public policy—federal or state— 'favoring' arbitration."). The court of appeals *in this case* needed no such reminder, stating, "The FAA requires that courts treat arbitration agreements the same as all other contracts—no more, no less." *Lampo*, 437 S.C. at 241, 877 S.E.2d at 489. In other cases, however, our court of appeals has continued to recite this incorrect notion. *See, e.g.*, *Est. of Solesbee ex rel. Bayne v. Fundamental Clinical & Operational Servs., LLC*, 438 S.C. 638, 646, 885 S.E.2d 144, 148 (Ct. App. 2023) (incorrectly stating, "South Carolina's policy is to favor arbitration of disputes"). An arbitration contract is like any other contract: if it exists, it will be enforced according to its terms. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 417-19, 142 S. Ct. 1708, 1712-14, 212 L. Ed. 2d 753, 759-60 (2022) (unanimously rebuking the Eighth Circuit for creating "arbitration-specific variants of federal procedural rules" based on the incorrect notion of a "policy favoring arbitration" and stating, "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration").

Second, the parties hotly dispute whether Lampo received notice of the arbitration program and Amedisys's offer to enter an arbitration agreement. The court of appeals apparently agreed with the parties that notice was a significant issue, as it

dedicated a large portion of its opinion to discussing when an employee receives actual notice of an offer.  *Lampo*, 437 S.C. at 241-45, 877 S.E.2d at 489-91.  We do not believe notice is an issue in this case because Lampo clearly received and viewed the August 6 email containing instructions from her employer to read Amedisys's offer and the Dispute Resolution Agreement.  She then clicked the "Acknowledge" button in recognition of her obligation to read the document.  We agree without hesitation with the court of appeals' eventual conclusion, "Lampo received actual notice."  437 S.C. at 245, 877 S.E.2d at 491.

Third, Amedisys makes much of an employer's power to require that employees do what they are told, arguing in its brief that "there is an inherent understanding that employees will act with diligence in following an employer's instructions."  We completely agree an employer is entitled to require an employee to follow instructions, and to expect that when those instructions are given they will, in fact, be followed.  In this case, Amedisys was absolutely entitled to require that Lampo "Must Read" the August 6 email, and to insist in the body of the email "that the Company requires that you read" the "important time-sensitive materials" that became available upon clicking the "Acknowledge" button.  Amedisys could even have required that Lampo respond yes or no to its offer to form an arbitration agreement.  Certainly, if Lampo or any other employee refused to comply with its instructions, Amedisys could have disciplined or even fired her.  But this undisputed power to direct its employees to do these things does not change the law of contracts requiring that an offeree manifest her assent to the terms of a contract offer in order to accept it.  *See* Restatement (Second) of Contracts § 69 cmt. c ("The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."); 1 Timothy Murray, *Corbin on Contracts* § 3.19, at 499 ("[A]n offeror cannot, merely by saying that the offeree's silence will be taken as an acceptance, cause it to be operative as such.").

Fourth, this case is not about the third element of contract formation—consideration—as the question of whether consideration exists arises only upon a finding that an offer has been accepted.  But in one sense, consideration is inseparable from the analysis of the second element—acceptance.  Earlier, we emphasized that Lampo "simply continued to perform the job duties for which she was already under contract to be paid," and thus we held no inference of acceptance could arise from her continuing to work.  If she had been offered some additional consideration for her continued work, however, the consideration would be an additional circumstance from which an inference of acceptance might arise.  For example, if Amedisys had promised in the August 6 email that it would pay Lampo a $500 bonus if she did not opt out of the arbitration program, then her silence and

inaction in continuing to work might be seen as a manifestation of assent to the arbitration agreement. *Cf. Towles*, 338 S.C. at 40, 524 S.E.2d at 845 (employee given additional consideration in that he was informed he could not continue to work unless the arbitration offer was accepted). Thus, the hypothetical offer to exchange the $500 bonus for the employee's silence—consideration—provides a factual basis upon which a jury might determine that the employee accepted the offer, even though she said nothing and did nothing other than what she was already under contract to do.

Fifth, this case is not about technology. Instead, as we stated earlier, the resolution of this case turns on the application of longstanding, black-letter principles of contract law, or in the court of appeals' words, referring to these principles and the age-old cases that recite them, "the old chestnuts." *Lampo*, 437 S.C. at 244, 877 S.E.2d at 491 (quoting *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 260 (4th Cir. 2021)); *see Rowland*, 993 F.3d at 260 (describing "the old chestnuts" as "cases that remind us that . . . certain formalities are required for a contract to be formed"). Technology has changed the manner in which people interact, but it has not changed the bedrock principles of contract law. *See Lampo*, 437 S.C. at 244, 877 S.E.2d at 490 ("Courts judge online transactions by the same law that has long governed contracts memorialized by ink and paper."); *Rowland*, 993 F.3d at 260 ("All we are left to rest on are the formalities."). Thus, our analysis of whether Amedisys and Lampo entered into a valid agreement to arbitrate is simple—Lampo did not accept Amedisys's offer and is therefore not bound by the Dispute Resolution Agreement.

Finally, Amedisys cites a number of decisions from other jurisdictions that it contends have approved of similar efforts to force acceptance on silent and inactive employees through the use of the "opt-out" device. Some of the cases are distinguishable because they arose under different factual situations that are significant to the question of acceptance of a contract offer. Frankly, however, some of the cases are directly on point. As to those cases which are on point and which approve of the "opt-out" device, we respectfully disagree with the reasoning of those courts. We see the "opt-out" image as a clever disguise employed to circumvent the longstanding, black-letter principles of contract law we rely on today to resolve this case by cloaking an offeree's decision not to accept an offer with an attractive—but inapplicable—legal term to give silence and inaction the appearance of acceptance. As we stated above, this we will not accept.

Hearkening back to the Fourth Circuit's and the court of appeals' reminiscence of "the old chestnuts," we are reminded that many decades ago an insidious "blight"

destroyed the vast, *actual* old American Chestnut forests that stood guard over our eastern American landscape. *See generally* Susan Freinkel, AMERICAN CHESTNUT: THE LIFE, DEATH, AND REBIRTH OF A PERFECT TREE (2007). Today, we "opt out" of this new blight on the law of contracts so that the *metaphorical* "old chestnuts" of American contract law may yet stand guard over the sanctity of contract in South Carolina.

For the reasons explained above, we reverse the court of appeals and remand to the circuit court for discovery and trial.

**REVERSED AND REMANDED.**

**KITTREDGE, C.J., and JAMES, J., concur. VERDIN, J., dissenting in a separate opinion in which Acting Justice Kristi Fisher Curtis, concurs.**

**JUSTICE VERDIN, dissenting:**

With the utmost respect for my colleagues in the majority and their thoughtful reasoning, I respectfully dissent. I would affirm the court of appeals' decision, finding the Arbitration Agreement enforceable as a unilateral contract, with all requisite elements of contract formation satisfied.

First, I agree with Amedisys that much weight should be placed on the effect of agency law and its requirement that an employee "yield obedience to all reasonable rules, orders, and instructions of the employer . . . ." *Carson v. S.C. Dep't of Nat. Res.*, 371 S.C. 114, 119, 638 S.E.2d 45, 47 (2002) (quoting *Porter v. Pepsi-Cola Bottling Co. of Columbia*, 247 S.C. 370, 374, 147 S.E.2d 620, 622 (1966)). Here, Lampo received the Acknowledgement Form and was instructed to review the accompanying materials, which she acknowledged by clicking the "acknowledge" button. By doing so, she promised to review the materials, and because of the employer-employee relationship, knowledge of their contents should be imputed to her. *Burwell v. S.C. Nat'l Bank*, 288 S.C. 34, 39, 340 S.E.2d 786, 789 (1986) (finding that "every contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it"); *First Baptist Church of Timmonsville v. George A Creed & Son, Inc.*, 276 S.C. 597, 599, 281 S.E.2d 121, 123 (1981) (noting that "in the absence of a showing of fraud, mistake, unfair dealing or the like, a party to a contract incorporating an arbitration provision cannot escape the obligation of such a provision by simply declaring: 'But I did not read the whole agreement.'").

Second, I would find this Arbitration Agreement was a unilateral contract. A unilateral contract is formed when an offeror "promise[s] on one side" and the offeree accepts through performance. *McMahan v. McMahon*, 122 S.C. 336, 340, 115 S.E. 293, 294 (1922). In the employment context, a unilateral contract exists when there is (1) a specific offer, (2) communication of the offer to the employee, and (3) performance of job duties in reliance on the offer. *Prescott v. Farmers Tel. Co-op., Inc.*, 335 S.C. 330, 336, 516 S.E.2d 923, 926 (1999). Here, Amedisys made a specific offer by issuing the Arbitration Agreement, which outlined its terms and required acceptance through continued employment or rejection through the opt-out process. That offer was communicated to Lampo as her employer gave her, and required her to read, the Arbitration Agreement and explanatory materials. Further, Lampo performed her job duties in reliance on that offer because she knew that her continued employment meant acceptance, unless she opted out. That acceptance meant she and Amedisys promised to arbitrate. Thus, the *Prescott* elements were met and a binding unilateral contract was formed.

The majority raises concerns about the applicability of *Prescott* and the sufficiency of the executed consideration to form a unilateral contract. The hallmark of a unilateral contract is that "there is a promise on one side only; the consideration on the other side being executed." *McMahan*, 122 S.C. at 340, 115 S.E. at 294. South Carolina law, however, requires only that the consideration on the accepting side be executed, not that it be the valuable consideration in the contract. While past consideration will not form a valid contract, a contract may have more than one form of consideration, and any new consideration will make that contract enforceable. *Branch Banking and Tr. Co. of S.C. v. Carolina Crank & Core, Inc.*, 362 S.C. 647, 652–53, 608 S.E.2d 896, 899 (Ct. App. 2005). Here, the executed consideration—Lampo's continued employment—may be past consideration. However, the mutual promise to arbitrate is new consideration that demonstrates Lampo's continued employment was in reliance on that new promise and, therefore, the unilateral contract is enforceable.

Third, I would also find that the traditional elements of a contract are met. As stated, Amedisys made an offer by sending Lampo the Arbitration Agreement and requiring her to read it. *Prescott*, 335 S.C. at 336, 516 S.E.2d at 926 ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."). Lampo had actual knowledge of that offer, how to accept it, and how to reject it because her employer told her to read the provided materials that contained that information. *Towles v. United Health Care Corp.*, 338 S.C. 29, 37, 524 S.E.2d 839, 844 (Ct. App. 1999) (finding that an employee must have actual knowledge of a contract to arbitrate before they can accept). With knowledge of how to accept or reject the contract and what was being agreed upon, Lampo accepted the contract by continuing to work and not submitting the opt-out form. Finally, though Lampo's continued employment was past consideration, the Arbitration Agreement was supported by the valuable consideration of the mutual promise to arbitrate. *Evatt v. Campbell*, 234 S.C. 1, 8, 106 S.E.2d 447, 451 (1959) ("[m]utual promises also constitute a good consideration"); *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 275 (4th Cir. 1997) (noting that as long as both an employer and employee agree to arbitrate, sufficient consideration exists to form an arbitration agreement). Thus, all the elements of a unilateral and traditional contract are met.

This conclusion aligns with the prevailing view in other jurisdictions that failing to "opt-out of an arbitration program can, of course, constitute acceptance." *Duling v. Mid Am. Credit Union*, 63 Kan. App. 2d 428, 443 (Kan. Ct. App. 2022); *See also Providian Nat. Bank v. Conner*, 898 So.2d 714 (Ala. 2004); *Gentry v. Superior Ct.*, 42 Cal.4th 443, 467–68 (Cal. 2007); *Edelist v. MBNA Nat'l Bank*, 790 A.2d 1249

(Del. Super. 2001); *Tsadilas v. Providian Nat. Bank*, 786 N.Y.S.2d 478 (N.Y. 2004); *Canteen v. Charlotte Metro Credit Union*, 286 N.C. App. 539 (N.C. 2022); *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, (1st Cir. 2019); *Gezu v. Charter Commus.*, 17 F.4th 547 (5th Cir. 2021); *Uszak v. AT&T Mobility Services*, LLC, 658 Fed. Appx. 758 (6th Cir. 2016); *Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002); *Johnmohammadi v. Bloomingdale's Inc.*, 755 F.3d 1072 (9th Cir. 2014).

Ultimately, employers and employees are "not two typical parties contracting at arm's length." *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1109 (9th Cir. 2002). As discussed, long-standing rules govern the employer-employee relationship to make interactions predictable for both parties. In applying those rules here, Lampo was given a contract and was required to read it by her employer, that contract told her how to accept or reject it, and Lampo followed the instructions for accepting the contract. Accordingly, I would find Lampo responsible for that contract and affirm the court of appeals' decision.

**Acting Justice Kristi Fisher Curtis, concurs.**